# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                                  Case No. 08-53104

GREEKTOWN HOLDINGS, L.L.C., et al.[1]          In Proceedings Under
                                                        Chapter 11
          Debtors.                          Jointly Administered

_____/        Hon. Walter Shapero

## NOTICE OF CORRECTED EXHIBIT

Attached hereto at Exhibit 1 is a corrected copy of the Engagement Letter, as defined in and

attached to the Debtors' <u>Application to Employ and Retain Moelis & Company, LLC as</u>

<u>Investment Banker to the Debtors and Debtors-in-Possession</u> (Docket No. 489) (the

"<u>Application</u>"). Attached hereto as Exhibit 2 is a redlined version of the Engagement Letter,

showing corrections made to the Engagement Letter filed with the Application.

          Respectfully submitted:

          SCHAFER AND WEINER, PLLC

By:   / s / Brendan G. Best_____
     DANIEL J. WEINER (P32010)
     MICHAEL E. BAUM (P29446)
     RYAN HEILMAN (P63952)
     BRENDAN G. BEST (P66370)
     Counsel for Debtors
     40950 Woodward Ave., Ste. 100
     Bloomfield Hills, MI 48304
     (248) 540-3340
     bbest@schaferandweiner.com

Dated: October 6, 2008

---

[1] The Debtors' bankruptcy cases are jointly administered with Greektown Holdings, L.L.C. ("<u>Holdings</u>") Case No. 08-53104, Greektown Casino, L.L.C. ("<u>Greektown Casino</u>") Case No. 08-53106; Kewadin Greektown Casino, L.L.C. ("<u>Kewadin</u>") Case No. 08-53105; Monroe Partners, L.L.C. ("<u>Monroe</u>") 08-53107; Greektown Holdings II, Inc. ("<u>Holdings II</u>") Case No. 08-53108; Contract Builders Corporation ("<u>Builders</u>") Case No. 08-53110; Realty Equity Company Inc. ("<u>Realty</u>") Case No. 08-53112; and Trappers GC Partner, LLC ("<u>Trappers</u>") Case No. 08-53111.

**EXHIBIT 1**
**CORRECTED ENGAGEMENT LETTER**

MOELIS & COMPANY

245 PARK AVENUE
32ⁿᵈ Floor
NEW YORK, NEW YORK 10167

T 212.880.7300
F 212.880.4260

October 3, 2008

CONFIDENTIAL

Greektown Holdings, LLC
555 E. Lafayette Ave.
Detroit, Michigan 48226

Attention: Mr. Tom Miller

Ladies & Gentlemen:

    We are pleased to confirm the arrangements under which Greektown Holdings, LLC (together with its affiliates and subsidiaries as debtors and debtors in possession, the "Company" or "you") has engaged Moelis & Company LLC ("Moelis"), and together with Moelis' affiliates and subsidiaries, "we", "our" or "us") to act as its investment bankers, subject to the approval by the Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "Bankruptcy Court") in the pending bankruptcy cases (the "Bankruptcy Cases") in connection with the Company's Reorganization being conducted pursuant to Title 11 of the United States Code (the "Bankruptcy Code"). For purposes hereof, the term "Reorganization" means (a) any restructuring, reorganization, rescheduling, or recapitalization of all or any material portion of the Company's liabilities, however such result is achieved (a "Restructuring Transaction"); (b) any merger, consolidation, reorganization or other business combination pursuant to which an asset, property or business of the Company is combined with that of any person, group of persons, partnership, corporation or other entity through any means (including, without limitation, a secured creditor acquiring such assets through a credit bid) (a "Sale Transaction"), *provided, however,* any transaction involving the sale of assets in the ordinary course of the Company's business or other *de minimis* asset sales shall not be considered a Sale Transaction; or (c) one or a series of transactions in which the Company raises or issues (i) secured or unsecured debt (including, without limitation, any asset-backed debt or convertible debt, but specifically excluding any debtor-in-possession financing arranged in connection with or during a Bankruptcy Case); (ii) equity interests (including, without limitation, preferred stock or common stock) or equity-linked securities not otherwise referenced in clause (i) above; (iii) hybrid capital; or (iv) options, warrants or other rights to acquire equity interests in the Company or any of its subsidiaries or affiliates (a "Capital Transaction").

    1. As part of our engagement, we will perform the following services, as requested by you.

        1.     as deemed desirable by the Company, identify, review, negotiate, evaluate and initiate a Reorganization, including, but not limited to, evaluating alternative

LOS ANGELES | NEW YORK | BOSTON

NY\1447695.8

proposals for a Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

2.      solicit and evaluate indications of interest and proposals regarding any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) from current and/or potential lenders, equity investors, acquirers or strategic partners; and

3.      in coordination with the Company, prepare and implement a marketing plan and, working with the Company's management and based upon information provided by the Company, prepare one or more memoranda describing assets, properties or businesses to be sold in any Sale Transaction (each, a "Selling Memo"), provided that the Company shall have been given the opportunity to review such Selling Memo and shall have approved its distribution.

4.      review and analyze the business plans and financial projections prepared by the Company in the context of financial presentations to be used in a Selling Memo or Information Memo (as described herein), including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

5.      evaluate the Company's debt capacity and assist in the determination of an appropriate capital structure for the Company;

6.      based upon information provided by the Company, prepare one or more memoranda describing the Company and its businesses for use in potential Capital Transactions (each, an "Information Memo"); provided that the Company shall have been given the opportunity to review such Information Memo and shall have approved its distribution; and

7.      contact potential acquirers or investors that Moelis and the Company have agreed may be appropriate, and in rendering such services, Moelis may meet with representatives of such acquirers or investors and provide such representatives with the Selling Memo, the Information Memo and such additional information about the Company's assets, properties or businesses as may be appropriate and acceptable to the Company, subject to customary business confidentiality agreements in form and substance approved by the Company;

8.      be available at the Company's request to meet with its management, board of directors, creditor groups, equity holders, any official committees appointed in the Bankruptcy Cases, or other parties;

9.      if requested by the Company, participate in hearings before the Bankruptcy Court and the Michigan Gaming Control Board (the "MGCB") and in meetings or hearings with the City of Detroit and the Economic Development Corporation of the City of Detroit and provide relevant testimony that is related to any

NY\1447695.8

MOELIS & COMPANY

Restructuring Transaction, Sale Transaction or Capital Transaction or a plan of
reorganization or liquidation;

10.     compile, arrange and maintain an electronic data room in respect of a
        Restructuring Transaction, Sale Transaction and/or Capital Transaction;

11.     assist the Company and its advisors in reviewing, negotiating and finalizing any
        definitive agreement and other agreements related thereto in connection with any
        Restructuring Transaction, Sale Transaction or Capital Transaction; and

12.     such other investment banking services as may be agreed upon by Moelis and the
        Company in connection with any Reorganization.

2. In connection with our engagement, the Company will furnish Moelis with all
information that we reasonably deem necessary for purposes of our engagement (collectively, the
"Information") and will provide us with access to the officers, directors, employees, accountants,
counsel and other representatives of the Company. The Company agrees to advise us promptly
of any material event or change in the business, affairs, condition (financial or otherwise) of the
Company that occurs during the term of our engagement hereunder. The Company understands
and agrees that we, in performing our services hereunder, will use and rely upon the Information
as well as publicly available information regarding the Company, and that we do not assume
responsibility for independent verification of any Information, whether publicly available or
otherwise furnished to us, concerning the Company, including, without limitation, any financial
information, forecasts or projections, considered by us in connection with the rendering of our
services. Accordingly, we shall be entitled to assume and rely upon the accuracy and
completeness of all Information and are not required to conduct a physical inspection of any of
the properties or assets, or to prepare or obtain any independent evaluation or appraisal of any of
the assets or liabilities, of the Company. With respect to any financial forecasts and projections
made available to us by the Company and used by us in our analysis, we shall be entitled to
assume that such forecasts and projections have been reasonably prepared on bases reflecting the
best currently available estimates and judgments of the management of the Company as to the
matters covered thereby. Moelis shall seek the authorization by the Company to transmit any
Selling Memo or Information Memo to potential parties to a Sale Transaction or Capital
Transaction. The Company hereby acknowledges that all Information contained in any Selling
Memo or Information Memo will be provided by or based upon Information provided by the
Company or third parties, and that the Company will be solely responsible for the contents
thereof.

3. (a) As compensation for our services hereunder, the Company agrees to pay
separately to each of Moelis the following fees, subject to the rules and procedures of the
Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and
applicable local rules, guidelines and Bankruptcy Court orders:

(i) Monthly Fee. (A) The Company shall pay to Moelis a fee of $150,000 per month
during the term of this agreement (a "Monthly Fee") commencing on the date on
which Moelis' retention has been approved by a final order of the Bankruptcy Court

- 3 -

NY\1447695.8

08-53104-wsd   Doc 493   Filed 10/06/08   Entered 10/06/08 14:44:18   Page 5 of 37

(the "<u>Final Order</u>"). Unless otherwise ordered by the Bankruptcy Court, the first Monthly Fee to Moelis shall be payable upon the execution of this agreement, and all subsequent Monthly Fees to Moelis shall be payable prior to each monthly anniversary of this agreement.

(B) One hundred percent (100%) of all Monthly Fees actually paid to Moelis in cash shall be credited once against any Restructuring Transaction Fees, Sale Transaction Fees or Capital Transaction Fees (as defined below) payable to Moelis. For the avoidance of doubt, such credit shall be applied <u>only once</u> to a single Restructuring Transaction Fee, Sale Transaction Fee or Capital Transaction Fee due to Moelis.

If Moelis has completed its work on all Restructuring Transactions, Sale Transactions or Capital Transactions, but any such transactions have not received necessary governmental or administrative approvals, then the Monthly Fee Period shall end on the date of such completion and the Monthly Fee for such month shall be apportioned for the number of days of the Monthly Fee Period in such month shall be credited against any Restructuring Transaction Fees, Sale Transaction Fees or Capital Transaction Fees (as defined below) payable to the Advisors.

(ii) <u>Restructuring Transaction Fees</u>: In addition to the foregoing Monthly Fees (but subject to the credit of such Monthly Fees as described above), Moelis shall receive a cash fee in an amount equal to 0.85% of the amount of the Company's restructured liabilities (the "<u>Restructuring Transaction Fee</u>"); <u>provided</u> that in no event shall the aggregate amount of the Restructuring Transaction Fee exceed $5,500,000. For the purposes of this section, "restructured liabilities" shall include all securities, claims, debts, litigation claims, or other indebtedness or liabilities that are forgiven, compromised, modified or otherwise affected by any transaction consummated in connection with services we provide hereunder. The Restructuring Transaction Fee shall be earned and due and payable immediately upon the consummation of a Restructuring Transaction.

(iii) <u>Sale Transaction Fees</u>: In addition to the foregoing Monthly Fees (but subject to the credit of such Monthly Fees as described above), immediately upon closing of a Sale Transaction, Moelis shall have earned the Sale Transaction Fees (defined below) and the Company shall pay us a cash fee in an amount equal to 0.85% of the Transaction Value (as defined in ***Annex A*** hereto) (the "<u>Sale Transaction Fee</u>").

(iv) <u>Capital Transaction Fees</u>. In addition to the foregoing Monthly Fees (but subject to 3(a)(i)(B)), the Company shall pay Moelis a cash fee in an amount equal to (i) 1.00% of the aggregate amount of new debt raised in a Capital Transaction in the form of secured debt, (ii) 1.75% of the aggregate amount of new debt raised in a Capital Transaction in the form of senior unsecured debt, (iii) 2.25% of the aggregate amount of new debt raised in a Capital Transaction in the form of subordinated debt, (iv) 2.50% of the aggregate amount of new debt raised in a Capital Transaction in the form of convertible debt, (v) 3.75% of the aggregate amount or face value of new

NY\1447695.8

capital raised in a Capital Transaction in the form of preferred equity, including preferred equity-linked securities, options, warrants or other rights to acquire preferred equity interests of the Company, and (vi) 4.25% of the aggregate amount or face value of new capital raised in a Capital Transaction in the form of common equity, including, options, warrants or other rights to acquire common equity interests of the Company (except that only to the extent new capital is raised from parties listed in Annex C hereto, the fee payable to Moelis shall be reduced by 66 2/3% of the amount that would otherwise be payable pursuant to the terms of this paragraph; such reduction not applying to new capital raised from parties not listed in Annex C hereto) (the "Capital Transaction Fee"). The Capital Transaction Fee shall be paid immediately upon the closing of each Capital Transaction.

(b)    We will be entitled to a Restructuring Transaction Fee, a Sale Transaction Fee or a Capital Transaction Fee based on the nature of the transaction. In the event that any single transaction involves two or more of a Restructuring Transaction, a Sale Transaction or a Capital Transaction, we shall receive a Restructuring Transaction Fee with respect to that portion of the transaction that is a Restructuring Transaction, a Sale Transaction Fee with respect to that portion of the transaction that is a Sale Transaction, and a Capital Transaction Fee with respect to that portion of the transaction that is a Capital Transaction. For the avoidance of doubt, we will not be entitled to all of a Restructuring Transaction Fee, a Sale Transaction Fee and a Capital Transaction Fee with respect to 100% of the value of such a transaction (*i.e.*, no "double-dipping").

(c)    Whether or not any Restructuring Transaction, Sale Transaction or Capital Transaction is consummated, and in addition to any fees payable to Moelis, the Company will reimburse us, upon our written request from time to time, for all reasonable out-of-pocket expenses incurred by Moelis in entering into this agreement and in connection with our performing services pursuant to this agreement. These expenses generally include travel costs, document reproduction, telephone and facsimile charges, and other customary expenses for this type of transaction, including the reasonable fees, disbursements and other charges of our legal counsel. We agree to provide reasonable detail relating to such out-of-pocket expenses to the extent requested by the Company or required by the Bankruptcy Court and such reimbursement will be subject to the monthly interim fee procedures established by the Bankruptcy Code and the Bankruptcy Court.

(d)    The parties acknowledge that a substantial professional commitment of time and effort will be required of us and our professionals hereunder, and that such commitment may foreclose other opportunities for us. Moreover, the actual time and commitment required for the engagement may vary substantially. In light of the numerous issues that may arise in engagements such as this, our commitment to the time and effort necessary to address the issues that will arise in this engagement, our expertise and capabilities that will be required in this engagement, and the market rate for professionals of our stature and reputation, the parties agree that the fee arrangement provided for herein is just and reasonable, fairly compensates us, and provides the requisite certainty to the Company.

NY\1447695.8

(e) Moelis acknowledges and agrees that it shall comply with all applicable laws, ordinances, rules, regulations, restrictions and orders of any public authority or governmental entity, including but not limited to, the Development Agreement between the Company and the City of Detroit and the MGCB (including, but not limited to, Moelis' employees receiving an Occupational Michigan Gaming Control Board License if work is needed to be done on the casino floor and/or restricted area of the casino).

4. (a) The Company shall file an application to retain Moelis as soon as practicable, and shall use its reasonable best efforts to cause such application to be considered on a reasonably expedited basis reasonably possible. The retention application and the proposed order authorizing Moelis' retention must be acceptable to Moelis in its sole discretion. The Company shall use its reasonable best efforts to seek an order of the Bankruptcy Court authorizing the separate employment of Moelis as its investment banker pursuant to the terms of this agreement (including, without limitation, the fee, expense, and indemnification provisions hereof) pursuant to, and subject to the standards of review set forth in, section 328(a) of the Bankruptcy Code (and not subject to the standards of review set forth in section 330 of the Bankruptcy Code). In agreeing to seek the retention of Moelis under section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Moelis' general restructuring experience and expertise, its knowledge of the capital markets and its restructuring capabilities will inure to the benefit of the Company, that the value to the Company of Moelis' services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees set forth in Section 3 herein are reasonable, regardless of the number of hours expended by Moelis' professionals in the performance of the services to be provided hereunder.

(b) Moelis shall not have any obligation to provide services under this or any agreement, unless its retention under this agreement is approved under the Final Order(acceptable to Moelis in its sole discretion, which order must also approve the indemnification provisions in *Annex B* of this agreement) under section 328(a) of the Bankruptcy Code, within 60 days of the date first written above. If (x) the Final Order is not obtained within such 60-day period, or (y) such order is later reversed, vacated, stayed or set aside for any reason, Moelis may terminate this agreement, and with respect to any termination pursuant to clause (y), the Company shall be obligated to reimburse Moelis for all fees and expenses it incurred prior to the date of such termination, subject to the requirements of any applicable orders of the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, guidelines and Bankruptcy Court orders. Following entry of the order authorizing the retention of Moelis, the Company shall pay as promptly as possible all fees and expenses that have been earned by, and are due and payable to, Moelis pursuant to this agreement, as approved by the Bankruptcy Court and in accordance with the terms of this agreement, the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, guidelines and Bankruptcy Court orders.

(c) The Company agrees that Moelis' post-petition compensation as set forth herein and payments made pursuant to the expense reimbursements and indemnification provisions of this agreement (including, without limitation, *Annex B* hereto) shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code,

NY\1447695.8

and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing orders entered by the Bankruptcy Court. The Company also agrees to assist Moelis in preparing, filing and serving all required fee statements, interim fee applications, and final fee applications. The Company agrees to support Moelis' fee applications during any Bankruptcy Court hearing on such fee applications, so long as the fees and expenses sought by Moelis therein are earned and due and payable under this agreement.

(d) The terms of this Section 4 are solely for the benefit of Moelis, and the provisions thereof may be waived, in whole or in part, only by Moelis in its sole discretion.

5. The Company understands that if Moelis is asked to act for the Company in any additional capacity relating to this engagement but not specifically addressed in this agreement, then such activities shall constitute separate engagements and the terms of any such additional engagements will be embodied in one or more separate written agreements, containing terms and conditions to be mutually agreed upon, including, without limitation, appropriate indemnification provisions. The indemnity provisions in ***Annex B*** referred to below shall apply to any such additional engagements, unless superseded by an indemnity provision set forth in a separate agreement applicable to any such additional engagements, and shall remain in full force and effect regardless of any completion, modification or termination of our engagement(s).

6. No advice or opinion rendered by us, whether formal or informal, may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to without our prior written consent, except as required by applicable law or governmental or stock exchange regulation and except as otherwise set forth below. In addition, we may not be otherwise referred to without our prior written consent, which shall not be unreasonably withheld. It is understood, however, that if we are requested to render an opinion, the opinion may be included in its entirety (including all attachments thereto) in any communication by the Company or the Board of Directors to parties in interest in the Bankruptcy Cases; provided, however, that we shall have had the opportunity to review such communication prior to any filing with the Securities and Exchange Commission or prior to its dissemination to parties in interest in the Bankruptcy Cases. The Company acknowledges that we may, at our option and expense and after announcement of any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), place announcements and advertisements or otherwise publicize and our role in the transaction (which may include the reproduction of the Company's logo and a hyperlink to the Company's website) on our respective websites and in such financial and other newspapers and journals as we may choose, stating that we have acted as investment banker to the Company in connection with any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof). Furthermore, if requested by us, the Company shall include a mutually acceptable reference to us in any press release or other public announcement made by the Company regarding the matters described in this agreement, and we shall not unreasonably withhold our consent in connection with the inclusion of the name(s) in any press release of the Company.

NY\1447695.8

7. Since we will be acting on behalf of the Company in connection with our engagement hereunder, the Company and we agree to the indemnity provisions and other matters set forth in *Annex B,* which is incorporated by reference into this agreement.

8.     (a)  Our engagement hereunder shall commence on the date the Final Order is entered, and shall extend until the earliest of (a) the effective date of a Chapter 11 plan of reorganization or liquidation confirmed in the Bankruptcy Cases, (b) the conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code, (c) appointment of a chapter 11 trustee or an examiner with expanded powers in the Bankruptcy Cases, and (d) dismissal of the Bankruptcy Cases; provided, however, that our engagement may be (x) terminated earlier, with or without cause, either by us or by you upon 30 days' prior written notice thereof to the other party, (y) terminated earlier as provided elsewhere herein or (z) extended, in writing, by the Company and us.  Notwithstanding the foregoing, in the event of any expiration or termination of our engagement hereunder, (a) we will continue to be entitled to payment by the Company's bankruptcy estates of the fees that have been earned in accordance with the terms of this agreement but unpaid as of the date of the termination pursuant to Section 3 of this agreement, (b) expenses to be reimbursed hereunder and incurred by us as a result of services rendered prior to the date of expiration or termination shall become immediately payable by the Company's bankruptcy estates in full, and (c) (i) the Company's obligation to indemnify us and certain related persons and entities as provided in *Annex B* referred to above and (ii) the provisions of Sections 4(c), 6, 7, 8, 10 and 11 hereof, shall remain operative and in full force and effect regardless of any such termination or expiration.

(b)  If, at any time prior to the expiration of 12 months following the expiration or termination of our engagement hereunder, a Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) is consummated, or if the Company enters into an agreement regarding a Restructuring Transaction, Sale Transaction, or Capital Transaction (or any combination thereof) (which is subsequently consummated), then the Company shall pay us the appropriate fee specified in Section 3 above immediately upon the closing of such transaction (the "Tail Fee").  The Company agrees not to object to our request for allowance of any Tail Fee by the Bankruptcy Court or any appellate court, so long as the Tail Fee is payable under the terms hereof.  The Tail Fee shall not be payable to us if we already received a Restructuring Transaction Fee, a Sale Transaction Fee or a Capital Transaction Fee on account of another transaction.  The Tail Fee also shall not be payable to us, if (i) this agreement is terminated pursuant to section 3(e) hereof, (ii) we materially breach this agreement, (iii) we are finally determined by a court of competent jurisdiction to have engaged in acts or failures to act that constitute bad faith, willful misconduct or gross negligence or (iv) we terminate this agreement without cause.

9. Moelis is a securities firm engaged in a number of merchant banking and investment banking activities.  Information which is held elsewhere by Moelis, but of which none of the individuals involved in providing services contemplated by this agreement actually has (or without breach of internal procedures can properly obtain) knowledge, will not for any purpose be taken into account in determining Moelis' responsibilities to the Company under this agreement.  Moelis will have no duty to disclose to the Company or utilize for the Company's

- 8 -

benefit any nonpublic information acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

10. The obligations of the Company hereunder shall be the joint and several obligations of the entities comprising the Company. In connection with this engagement, we are acting as independent contractors and not in any other capacity, with duties owing solely to the Company. All aspects of the relationship created by this agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. All actions and proceedings arising out of or relating to this agreement shall be heard and determined by the Bankruptcy Court. If the Bankruptcy Court declines to assert jurisdiction over such proceedings, then the parties agree that any state or federal court of competent jurisdiction sitting in the state of Michigan shall have non-exclusive jurisdiction over such actions and proceedings. WE AND THE COMPANY HEREBY AGREE TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THE AGREEMENT OR OUR PERFORMANCE THEREUNDER.

11. This agreement (including all Annexes hereto) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction (including the Bankruptcy Court) to be invalid, void, unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. This agreement may not be amended or otherwise modified or waived except by an instrument in writing signed by both us and the Company. This agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. This agreement shall be binding upon the Company and us and its and our respective successors and permitted assigns.

12. We acknowledge and agree that we may not assign or delegate our obligations and rights under, and our consideration pursuant to, this Agreement to any other person without the prior written consent of the Company, which may be granted or withheld in the Company's sole discretion.

*(Signature page follows)*

NY\1447695.8

We are delighted to accept this engagement and look forward to working with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this agreement. By affixing your signature hereto, you represent that you are a person authorized by the Company to enter into this agreement on its behalf.

Very truly yours,

MOELIS & COMPANY LLC

By:_____

Name:  Thane Carlston
Title:    Managing Director


Accepted and agreed to as of the date first written above:

GREEKTOWN HOLDINGS, LLC


By:_____

Name:  Tom Miller
Title:    Authorized Manager

NY\1447695.8

# M O E L I S & C O M P A N Y

We are delighted to accept this engagement and look forward to working with you on this
assignment. Please confirm that the foregoing is in accordance with your understanding by
signing and returning to us the enclosed duplicate of this agreement. By affixing your signature
hereto, you represent that you are a person authorized by the Company to enter into this
agreement on its behalf.

Very truly yours,

MOELIS & COMPANY LLC

By: _____
      Name: Thane Carlston
      Title:  Managing Director

Accepted and agreed to as of the date first written above:

GREEKTOWN HOLDINGS, LLC

By: _____
   Name: Tom Miller
   Title:  Authorized Manager

- 10 -

MOELIS & COMPANY

## ANNEX A

For the purposes hereof, "Transaction Value" shall equal an amount equal to the sum of (a) the aggregate fair market value (as determined below) of any securities issued, credit bid and any other non-cash consideration delivered by any Acquirer (including, without limitation, any joint venture interest delivered to, or acquired by, the Company), and any cash consideration paid by any Acquirer to the Company in connection with a Sale Transaction (including, without limitation and without duplication, cash consideration in respect of a Sale Transaction that is paid, at the direction of the Company, to retire or defease indebtedness for borrowed money or indebtedness evidenced by a note, of the Company or any of its subsidiaries, or to cure defaults under executory contracts to be assumed), plus payments made in installments, plus contingent payments (whether or not related to future earnings or operations) (subject to the payment terms set forth below), and (b) without duplication of amounts described in clause (a) above, the amount of all indebtedness for borrowed money or indebtedness evidenced by a note, of any entity owning the asset, property or business which is assumed or acquired by an Acquirer in connection with the Sale Transaction; provided, that "Transaction Value" shall not include, and to the extent applicable, there shall be deducted from any calculation of "Transaction Value" any amounts which the Company has agreed, or is otherwise obligated, to pay to or on behalf of an Acquirer at or following the closing of the Sale Transaction with respect to any costs or expenses related to the asset, property or operations of a business being sold. The fair market value of any debt or securities issued and any other non-cash consideration delivered to or acquired by the Company in connection with a Sale Transaction will be the value determined in good faith by the Company and us.

Notwithstanding any provision in this agreement to the contrary, if all or a portion of the Transaction Value consists of installment, contingent or other future payments (including amounts paid into escrow), then that portion of the Sale Transaction Fee attributable thereto shall be payable to us only upon actual receipt by the Company of such installment, contingent or other future payment.

MOELIS & COMPANY

## ANNEX B

In further consideration of the agreements contained in our engagement letter dated the date hereof (the "engagement"), in the event that Moelis or any of its divisions, affiliates, directors, officers, partners, members, agents or employees or any of its affiliates, or any other person controlling us or any of our affiliates (collectively, the "Indemnified Persons") becomes involved in any capacity in any action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person (including, without limitation, creditors of Greektown Holdings, LLC (the "Company"), members of the Company, a receiver, a custodian, a trustee appointed in any case or cases under title 11 of the United States Code commenced by or against the Company or any of its subsidiaries or affiliates, whether individually or on a consolidated basis (a "Bankruptcy Case"), an official committee appointed in a Bankruptcy Case, or a litigation trust, liquidating trust or similar vehicle created in connection with a Bankruptcy Case (or a trustee of such trust or similar vehicle)), in connection with or as a result of the engagement or any matter referred to in the engagement, the Company will reimburse such Indemnified Person for its reasonable and customary legal and other expenses (including, without limitation, the costs and expenses incurred in connection with investigating, preparing for and responding to third-party subpoenas or enforcing the engagement) incurred in connection therewith as such expenses are incurred. The Company will also indemnify and hold harmless any Indemnified Person from and against, and the Company agrees that no Indemnified Person shall have any liability to the Company or its owners, parents, affiliates, security holders or creditors for, any losses, claims, damages or liabilities (including actions or proceedings in respect thereof) (collectively, "Losses") (A) related to or arising out of (i) the Company's actions or failures to act (including statements or omissions made or information provided by the Company or its agents) or (ii) actions or failures to act by an Indemnified Person with the Company's consent or in reliance on the Company's actions or failures to act or (B) otherwise related to or arising out of the engagement or our performance thereof, except that this clause (B) shall not apply (i) to any Losses that are finally determined by a court or arbitral tribunal to have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

If such indemnification for any reason (other than such Indemnified Person's bad faith, willful misconduct or gross negligence as finally determined by a court of competent jurisdiction or arbitral tribunal to have caused the Losses) is not available or is insufficient to hold an Indemnified Person harmless, the Company agrees to contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, on the one hand, and by us, on the other hand, with respect to the engagement or, if such allocation is determined by a court or arbitral tribunal to be unavailable, in such proportion as is appropriate to reflect other equitable considerations, such as the relative fault of the Company on the one hand and of us on the other hand; provided, however, that, to the extent permitted by applicable law, the Indemnified Persons shall not be responsible for amounts which, in the aggregate, are in excess of the amount of all fees actually received by us from the Company in connection with the engagement. Relative benefits to the Company, on the one hand, and us, on the other hand, with respect to the engagement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by the Company or its security holders, as the case may be, pursuant to the

transaction(s), whether or not consummated, contemplated by the engagement, bears to (ii) all fees actually received by us in connection with the engagement.

The Company will not, without our prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination includes a release of each Indemnified Person from any liabilities arising out of such action, claim, suit, investigation or proceeding. The Company will not permit any such settlement, compromise, consent or termination to include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of an Indemnified Person, without such Indemnified Person's prior written consent. No Indemnified Person seeking indemnification, reimbursement or contribution under this agreement will, without the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

Prior to entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify us in writing thereof (if not previously so notified) and, if requested by us, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein in an amount and upon terms and conditions that we reasonably believe will satisfy the Company's obligations.

Promptly (and in any event within five days) after receipt by an Indemnified Person of actual notice of its involvement in any action, proceeding or investigation (collectively, "Proceeding") for which indemnification is being sought hereunder, such Indemnified Person will notify the Company in writing of such involvement. Failure to so notify the Company will not relieve the Company from liability which it may have to any Indemnified Person hereunder, except to the extent that the Company is prejudiced in any respect by such failure, and the Company will not be required to bear any fees or disbursements of counsel retained by an Indemnified Person that were incurred prior to the delivery of such notice to the Company. The Company shall be entitled to assume the defense of all Indemnified Persons in connection with the Proceeding, including the employment of counsel reasonably satisfactory to such Indemnified Person, and the payment of the fees and disbursements of such counsel. Notwithstanding the Company's decision to assume the defense of any Proceeding, (x) its right to enter into any compromise or settlement of the Proceeding shall be limited as set forth in the next paragraph of this Annex B, and (y) the Indemnified Person shall have the right to employ separate counsel and to participate in the defense of the Proceeding. Such counsel shall be at the expense of the Indemnified Person, unless (i) representation of the Company and the Indemnified Person by the same counsel, or conduct by the Company of the defense of the Indemnified Person, would be inappropriate due to actual or potential differing interests between the Company and such Indemnified Person (including any allegation that an Indemnified Person acted or failed to act in bad faith, engaged

NY\1447695.8

in willful misconduct, or was grossly negligent), (ii) there may be defenses available to the Indemnified Person which are different from the defenses available to the Company or (iii) the Company fails to assume the defense of the Proceeding or to employ counsel reasonably satisfactory to the Indemnified Person, in each case in a timely manner, which prejudices such Indemnified Person. In the event of the circumstances set forth in the immediately preceding sentence, then the Indemnified Person may employ separate counsel at the Company's expense to represent or defend it in any such Proceeding or group of related Proceedings (it being agreed that the Company shall not, under any of the circumstances described in clause (i) or (ii) of the immediately preceding sentence, have the right to direct the defense of the Proceeding on behalf of the Indemnified Person). In no event shall the Company be liable for the fees and expenses of more than one separate firm of attorneys for all Indemnified Persons in connection with any Proceeding, plus one firm of local counsel in each jurisdiction in which any such Proceeding is taking place.

The Company's obligations hereunder shall be in addition to any rights that any Indemnified Person may have at common law or otherwise. The Company acknowledges that in connection with the engagement we are acting as an independent contractor and not in any other capacity, with duties owing solely to the Company. This agreement and any other agreements relating to the engagement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. All actions and proceedings arising out of or relating to this agreement shall be heard and determined by the Bankruptcy Court. If the Bankruptcy Court declines to assert jurisdiction over such proceedings, then the parties agree that any state or federal court of competent jurisdiction sitting in the state of Michigan shall have non-exclusive jurisdiction over such actions and proceedings. WE HEREBY AGREE, AND THE COMPANY HEREBY AGREES TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THE ENGAGEMENT OR OUR PERFORMANCE THEREOF.

NY\1447695.8

**M O E L I S  &  C O M P A N Y**

The provisions of this *Annex B* shall apply to the engagement referred to in the engagement letter dated the date hereof (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement.  If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.


GREEKTOWN HOLDINGS, LLC


By: _____
     Name: Tom Miller
     Title:  Authorized Manager


Accepted and agreed to as of the date hereof:


MOELIS & COMPANY LLC


By: _____
     Name: Thane Carlston
     Title:  Managing Director

NY\1447695.8

The provisions of this *Annex B* shall apply to the engagement referred to in the engagement letter dated the date hereof (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

GREEKTOWN HOLDINGS, LLC


By: _____
    Name: Tom Miller
    Title:  Authorized Manager


Accepted and agreed to as of the date hereof:

MOELIS & COMPANY LLC

By: _____
    Name: Thane Carlston
    Title:  Managing Director

- B-4 -

NY\1447695.8

## ANNEX C

1.     Any entity engaged in the gaming business, which is at least majority-owned by one or more Native American tribes

2.     Entertainment Interest Group, LLC

3.     Ted Gatzaros

4.     Penn National Gaming Inc.

5.     Millennium Management Group, L.L.C. and its affiliates

**EXHIBIT 2**
**CORRECTED ENGAGEMENT LETTER – REDLINED VERSION**

M O E L I S  &  C O M P A N Y

~~September 25,~~ **October 3,** 2008

CONFIDENTIAL

Greektown Holdings, LLC
555 E. Lafayette Ave.
Detroit, Michigan 48226

Attention: Mr. ~~D. Joe McCoy~~**Tom Miller**

Ladies & Gentlemen:

   We are pleased to confirm the arrangements under which Greektown Holdings, LLC (together with its affiliates and subsidiaries as debtors and debtors in possession, the "Company" or "you") has engaged Moelis & Company LLC ("Moelis"), and together with Moelis' affiliates and subsidiaries, "we", "our" or "us") to act as its investment bankers, subject to the approval by the Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "Bankruptcy Court") in the pending bankruptcy cases (the "Bankruptcy Cases") in connection with the Company's Reorganization being conducted pursuant to Title 11 of the United States Code (the "Bankruptcy Code"). For purposes hereof, the term "Reorganization" means (a) any restructuring, reorganization, rescheduling, or recapitalization of all or any material portion of the Company's liabilities, however such result is achieved (a "Restructuring Transaction"); (b) any merger, consolidation, reorganization or other business combination pursuant to which an asset, property or business of the Company is combined with that of any person, group of persons, partnership, corporation or other entity through any means (including, without limitation, a secured creditor acquiring such assets through a credit bid) (a "Sale Transaction"), *provided, however*, any transaction involving the sale of assets in the ordinary course of the Company's business or other *de minimis* asset sales shall not be considered a Sale Transaction; or (c) one or a series of transactions in which the Company raises or issues (i) secured or unsecured debt (including, without limitation, any asset-backed debt or convertible debt, but specifically excluding any debtor-in-possession financing arranged in connection with or during a Bankruptcy Case); (ii) equity interests (including, without limitation, preferred stock or common stock) or equity-linked securities not otherwise referenced in clause (i) above; (iii) hybrid capital; or (iv) options, warrants or other rights to acquire equity interests in the Company or any of its subsidiaries or affiliates (a "Capital Transaction").

   1. As part of our engagement, we will perform the following services, as requested by you.

   **1.**   ~~(i)~~as deemed desirable by the Company, identify, review, negotiate, evaluate and initiate a Reorganization, including, but not limited to, evaluating alternative

proposals for a Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

2. (ii) solicit and evaluate indications of interest and proposals regarding any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) from current and/or potential lenders, equity investors, acquirers or strategic partners; and

3. (iii) in coordination with the Company, prepare and implement a marketing plan and, working with the Company's management and based upon information provided by the Company, prepare one or more memoranda describing assets, properties or businesses to be sold in any Sale Transaction (each, a "Selling Memo"), provided that the Company shall have been given the opportunity to review such Selling Memo and shall have approved its distribution.

4. (iv) review and analyze the business plans and financial projections prepared by the Company in the context of financial presentations to be used in a Selling Memo or Information Memo (as described herein), including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

5. (v) evaluate the Company's debt capacity and assist in the determination of an appropriate capital structure for the Company;

6. (vi) based upon information provided by the Company, prepare one or more memoranda describing the Company and its businesses for use in potential Capital Transactions (each, an "Information Memo"); provided that the Company shall have been given the opportunity to review such Information Memo and shall have approved its distribution; and

7. (vii) contact potential acquirers or investors that Moelis and the Company have agreed may be appropriate, and in rendering such services, Moelis may meet with representatives of such acquirers or investors and provide such representatives with the Selling Memo, the Information Memo and such additional information about the Company's assets, properties or businesses as may be appropriate and acceptable to the Company, subject to customary business confidentiality agreements in form and substance approved by the Company;

8. (viii) be available at the Company's request to meet with its management, board of directors, creditor groups, equity holders, any official committees appointed in the Bankruptcy Cases, or other parties;

9. (ix) if requested by the Company, participate in hearings before the Bankruptcy Court and the Michigan Gaming Control Board (the "MGCB") and in meetings or hearings with the City of Detroit and the Economic Development Corporation of the City of Detroit and provide relevant testimony that is related to any

Restructuring Transaction, Sale Transaction or Capital Transaction or a plan of reorganization or liquidation;

**10.** (x) compile, arrange and maintain an electronic data room in respect of a Restructuring Transaction, Sale Transaction and/or Capital Transaction;

**11.** (xi) assist the Company and its advisors in reviewing, negotiating and finalizing any definitive agreement and other agreements related thereto in connection with any Restructuring Transaction, Sale Transaction or Capital Transaction; and

**12.** (xii) such other investment banking services as may be agreed upon by Moelis and the Company in connection with any Reorganization.

2. In connection with our engagement, the Company will furnish Moelis with all information that we reasonably deem necessary for purposes of our engagement (collectively, the "Information") and will provide us with access to the officers, directors, employees, accountants, counsel and other representatives of the Company. The Company agrees to advise us promptly of any material event or change in the business, affairs, condition (financial or otherwise) of the Company that occurs during the term of our engagement hereunder. The Company understands and agrees that we, in performing our services hereunder, will use and rely upon the Information as well as publicly available information regarding the Company, and that we do not assume responsibility for independent verification of any Information, whether publicly available or otherwise furnished to us, concerning the Company, including, without limitation, any financial information, forecasts or projections, considered by us in connection with the rendering of our services. Accordingly, we shall be entitled to assume and rely upon the accuracy and completeness of all Information and are not required to conduct a physical inspection of any of the properties or assets, or to prepare or obtain any independent evaluation or appraisal of any of the assets or liabilities, of the Company. With respect to any financial forecasts and projections made available to us by the Company and used by us in our analysis, we shall be entitled to assume that such forecasts and projections have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of the Company as to the matters covered thereby. Moelis shall seek the authorization by the Company to transmit any Selling Memo or Information Memo to potential parties to a Sale Transaction or Capital Transaction. The Company hereby acknowledges that all Information contained in any Selling Memo or Information Memo will be provided by or based upon Information provided by the Company or third parties, and that the Company will be solely responsible for the contents thereof.

3. (a) As compensation for our services hereunder, the Company agrees to pay separately to each of Moelis the following fees, subject to the rules and procedures of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable local rules, guidelines and Bankruptcy Court orders:

(i) Monthly Fee. (A) The Company shall pay to Moelis a fee of $150,000 per month during the term of this agreement (a "Monthly Fee") commencing on the date on which Moelis' retention has been approved by a final order of the Bankruptcy Court

(the "Final Order"). Unless otherwise ordered by the Bankruptcy Court, the first Monthly Fee to Moelis shall be payable upon the execution of this agreement, and all subsequent Monthly Fees to Moelis shall be payable prior to each monthly anniversary of this agreement.

(B) One hundred percent (100%) of all Monthly Fees actually paid to Moelis in cash shall be credited once against any Restructuring Transaction Fees, Sale Transaction Fees or Capital Transaction Fees (as defined below) payable to Moelis. For the avoidance of doubt, such credit shall be applied only once to a single Restructuring Transaction Fee, Sale Transaction Fee or Capital Transaction Fee due to Moelis.

If Moelis has completed its work on all Restructuring Transactions, Sale Transactions or Capital Transactions, but any such transactions have not received necessary governmental or administrative approvals, then the Monthly Fee Period shall end on the date of such completion and the Monthly Fee for such month shall be apportioned for the number of days of the Monthly Fee Period in such month shall be credited against any Restructuring Transaction Fees, Sale Transaction Fees or Capital Transaction Fees (as defined below) payable to the Advisors.

(ii) Restructuring Transaction Fees: In addition to the foregoing Monthly Fees (but subject to the credit of such Monthly Fees as described above), Moelis shall receive a cash fee in an amount equal to 0.85% of the amount of the Company's restructured liabilities (the "Restructuring Transaction Fee"); provided that in no event shall the aggregate amount of the Restructuring Transaction Fee exceed $5,500,000. For the purposes of this section, "restructured liabilities" shall include all securities, claims, debts, litigation claims, or other indebtedness or liabilities that are forgiven, compromised, modified or otherwise affected by any transaction consummated in connection with services we provide hereunder. The Restructuring Transaction Fee shall be earned and due and payable immediately upon the consummation of a Restructuring Transaction.

(iii) Sale Transaction Fees: In addition to the foregoing Monthly Fees (but subject to the credit of such Monthly Fees as described above), immediately upon closing of a Sale Transaction, Moelis shall have earned the Sale Transaction Fees (defined below) and the Company shall pay us a cash fee in an amount equal to 0.85% of the Transaction Value (as defined in *Annex A* hereto) (the "Sale Transaction Fee").

(iv) Capital Transaction Fees. In addition to the foregoing Monthly Fees (but subject to 3(a)(i)(B)), the Company shall pay Moelis a cash fee in an amount equal to (i) 1.00% of the aggregate amount of new debt raised in a Capital Transaction in the form of secured debt, (ii) 1.75% of the aggregate amount of new debt raised in a Capital Transaction in the form of senior unsecured debt, (iii) 2.25% of the aggregate amount of new debt raised in a Capital Transaction in the form of subordinated debt, (iv) 2.50% of the aggregate amount of new debt raised in a Capital Transaction in the form of convertible debt, (v) 3.75% of the aggregate amount or face value of new

capital raised in a Capital Transaction in the form of preferred equity, including preferred equity-linked securities, options, warrants or other rights to acquire preferred equity interests of the Company, and (vi) 4.25% of the aggregate amount or face value of new capital raised in a Capital Transaction in the form of common equity, including, options, warrants or other rights to acquire common equity interests of the Company (except that only to the extent new capital is raised from parties listed in Annex C hereto, the fee payable to Moelis shall be reduced by 66 2/3% of the amount that would otherwise be payable pursuant to the terms of this paragraph; such reduction not applying to new capital raised from parties not listed in Annex C hereto) (the "Capital Transaction Fee"). The Capital Transaction Fee shall be paid immediately upon the closing of each Capital Transaction.

(b)   We will be entitled to a Restructuring Transaction Fee, a Sale Transaction Fee or a Capital Transaction Fee based on the nature of the transaction. In the event that any single transaction involves two or more of a Restructuring Transaction, a Sale Transaction or a Capital Transaction, we shall receive a Restructuring Transaction Fee with respect to that portion of the transaction that is a Restructuring Transaction, a Sale Transaction Fee with respect to that portion of the transaction that is a Sale Transaction, and a Capital Transaction Fee with respect to that portion of the transaction that is a Capital Transaction. For the avoidance of doubt, we will not be entitled to all of a Restructuring Transaction Fee, a Sale Transaction Fee and a Capital Transaction Fee with respect to 100% of the value of such a transaction (*i.e.*, no "double-dipping").

(c) Whether or not any Restructuring Transaction, Sale Transaction or Capital Transaction is consummated, and in addition to any fees payable to Moelis, the Company will reimburse us, upon our written request from time to time, for all reasonable out-of-pocket expenses incurred by Moelis in entering into this agreement and in connection with our performing services pursuant to this agreement. These expenses generally include travel costs, document reproduction, telephone and facsimile charges, and other customary expenses for this type of transaction, including the reasonable fees, disbursements and other charges of our legal counsel. We agree to provide reasonable detail relating to such out-of-pocket expenses to the extent requested by the Company or required by the Bankruptcy Court and such reimbursement will be subject to the monthly interim fee procedures established by the Bankruptcy Code and the Bankruptcy Court.

(d) The parties acknowledge that a substantial professional commitment of time and effort will be required of us and our professionals hereunder, and that such commitment may foreclose other opportunities for us. Moreover, the actual time and commitment required for the engagement may vary substantially. In light of the numerous issues that may arise in engagements such as this, our commitment to the time and effort necessary to address the issues that will arise in this engagement, our expertise and capabilities that will be required in this engagement, and the market rate for professionals of our stature and reputation, the parties agree that the fee arrangement provided for herein is just and reasonable, fairly compensates us, and provides the requisite certainty to the Company.

(e) Moelis acknowledges and agrees that it shall comply with all applicable laws, ordinances, rules, regulations, restrictions and orders of any public authority or governmental entity, including but not limited to, the Development Agreement between the Company and the City of Detroit and the MGCB (including, but not limited to, Moelis' employees receiving an Occupational Michigan Gaming Control Board License if work is needed to be done on the casino floor and/or restricted area of the casino).

4. (a) The Company shall file an application to retain Moelis as soon as practicable, and shall use its reasonable best efforts to cause such application to be considered on a reasonably expedited basis reasonably possible. The retention application and the proposed order authorizing Moelis' retention must be acceptable to Moelis in its sole discretion. The Company shall use its reasonable best efforts to seek an order of the Bankruptcy Court authorizing the separate employment of Moelis as its investment banker pursuant to the terms of this agreement (including, without limitation, the fee, expense, and indemnification provisions hereof) pursuant to, and subject to the standards of review set forth in, section 328(a) of the Bankruptcy Code (and not subject to the standards of review set forth in section 330 of the Bankruptcy Code). In agreeing to seek the retention of Moelis under section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Moelis' general restructuring experience and expertise, its knowledge of the capital markets and its restructuring capabilities will inure to the benefit of the Company, that the value to the Company of Moelis' services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees set forth in Section 3 herein are reasonable, regardless of the number of hours expended by Moelis' professionals in the performance of the services to be provided hereunder.

(b) Moelis shall not have any obligation to provide services under this or any agreement, unless its retention under this agreement is approved under the Final Order(acceptable to Moelis in its sole discretion, which order must also approve the indemnification provisions in **Annex B** of this agreement) under section 328(a) of the Bankruptcy Code, within 60 days of the date first written above. If (x) the Final Order is not obtained within such 60-day period, or (y) such order is later reversed, vacated, stayed or set aside for any reason, Moelis may terminate this agreement, and with respect to any termination pursuant to clause (y), the Company shall be obligated to reimburse Moelis for all fees and expenses it incurred prior to the date of such termination, subject to the requirements of any applicable orders of the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, guidelines and Bankruptcy Court orders. Following entry of the order authorizing the retention of Moelis, the Company shall pay as promptly as possible all fees and expenses that have been earned by, and are due and payable to, Moelis pursuant to this agreement, as approved by the Bankruptcy Court and in accordance with the terms of this agreement, the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, guidelines and Bankruptcy Court orders.

(c) The Company agrees that Moelis' post-petition compensation as set forth herein and payments made pursuant to the expense reimbursements and indemnification provisions of this agreement (including, without limitation, **Annex B** hereto) shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code,

and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing orders entered by the Bankruptcy Court. The Company also agrees to assist Moelis in preparing, filing and serving all required fee statements, interim fee applications, and final fee applications. The Company agrees to support Moelis' fee applications during any Bankruptcy Court hearing on such fee applications, so long as the fees and expenses sought by Moelis therein are earned and due and payable under this agreement.

(d) The terms of this Section 4 are solely for the benefit of Moelis, and the provisions thereof may be waived, in whole or in part, only by Moelis in its sole discretion.

5. The Company understands that if Moelis is asked to act for the Company in any additional capacity relating to this engagement but not specifically addressed in this agreement, then such activities shall constitute separate engagements and the terms of any such additional engagements will be embodied in one or more separate written agreements, containing terms and conditions to be mutually agreed upon, including, without limitation, appropriate indemnification provisions. The indemnity provisions in *Annex B* referred to below shall apply to any such additional engagements, unless superseded by an indemnity provision set forth in a separate agreement applicable to any such additional engagements, and shall remain in full force and effect regardless of any completion, modification or termination of our engagement(s).

6. No advice or opinion rendered by us, whether formal or informal, may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to without our prior written consent, except as required by applicable law or governmental or stock exchange regulation and except as otherwise set forth below. In addition, we may not be otherwise referred to without our prior written consent, which shall not be unreasonably withheld. It is understood, however, that if we are requested to render an opinion, the opinion may be included in its entirety (including all attachments thereto) in any communication by the Company or the Board of Directors to parties in interest in the Bankruptcy Cases; provided, however, that we shall have had the opportunity to review such communication prior to any filing with the Securities and Exchange Commission or prior to its dissemination to parties in interest in the Bankruptcy Cases. The Company acknowledges that we may, at our option and expense and after announcement of any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), place announcements and advertisements or otherwise publicize and our role in the transaction (which may include the reproduction of the Company's logo and a hyperlink to the Company's website) on our respective websites and in such financial and other newspapers and journals as we may choose, stating that we have acted as investment banker to the Company in connection with any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof). Furthermore, if requested by us, the Company shall include a mutually acceptable reference to us in any press release or other public announcement made by the Company regarding the matters described in this agreement, and we shall not unreasonably withhold our consent in connection with the inclusion of the name(s) in any press release of the Company.

7. Since we will be acting on behalf of the Company in connection with our engagement hereunder, the Company and we agree to the indemnity provisions and other matters set forth in *Annex B,* which is incorporated by reference into this agreement.

8.        (a) Our engagement hereunder shall commence on the date the Final Order is entered, and shall extend until the earliest of (a) the effective date of a Chapter 11 plan of reorganization or liquidation confirmed in the Bankruptcy Cases, (b) the conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code, (c) appointment of a chapter 11 trustee or an examiner with expanded powers in the Bankruptcy Cases, and (d) dismissal of the Bankruptcy Cases; provided, however, that our engagement may be (x) terminated earlier, with or without cause, either by us or by you upon 30 days' prior written notice thereof to the other party, (y) terminated earlier as provided elsewhere herein or (z) extended, in writing, by the Company and us. Notwithstanding the foregoing, in the event of any expiration or termination of our engagement hereunder, (a) we will continue to be entitled to payment by the Company's bankruptcy estates of the fees that have been earned in accordance with the terms of this agreement but unpaid as of the date of the termination pursuant to Section 3 of this agreement, (b) expenses to be reimbursed hereunder and incurred by us as a result of services rendered prior to the date of expiration or termination shall become immediately payable by the Company's bankruptcy estates in full, and (c) (i) the Company's obligation to indemnify us and certain related persons and entities as provided in *Annex B* referred to above and (ii) the provisions of Sections 4(c), 6, 7, 8, 10 and 11 hereof, shall remain operative and in full force and effect regardless of any such termination or expiration.

        (b) If, at any time prior to the expiration of 12 months following the expiration or termination of our engagement hereunder, a Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) is consummated, or if the Company enters into an agreement regarding a Restructuring Transaction, Sale Transaction, or Capital Transaction (or any combination thereof) (which is subsequently consummated), then the Company shall pay us the appropriate fee specified in Section 3 above immediately upon the closing of such transaction (the "Tail Fee"). The Company agrees not to object to our request for allowance of any Tail Fee by the Bankruptcy Court or any appellate court, so long as the Tail Fee is payable under the terms hereof. The Tail Fee shall not be payable to us if we already received a Restructuring Transaction Fee, a Sale Transaction Fee or a Capital Transaction Fee on account of another transaction. The Tail Fee also shall not be payable to us, if (i) this agreement is terminated pursuant to section 3(e) hereof, (ii) we materially breach this agreement ~~or,~~ (iii) we are finally determined by a court of competent jurisdiction to have engaged in acts or failures to act that constitute bad faith, willful misconduct or gross negligence **or (iv) we terminate this agreement without cause**.

9. Moelis is a securities firm engaged in a number of merchant banking and investment banking activities. Information which is held elsewhere by Moelis, but of which none of the individuals involved in providing services contemplated by this agreement actually has (or without breach of internal procedures can properly obtain) knowledge, will not for any purpose be taken into account in determining Moelis' responsibilities to the Company under this agreement. Moelis will have no duty to disclose to the Company or utilize for the Company's

benefit any nonpublic information acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

10. The obligations of the Company hereunder shall be the joint and several obligations of the entities comprising the Company. In connection with this engagement, we are acting as independent contractors and not in any other capacity, with duties owing solely to the Company. All aspects of the relationship created by this agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. All actions and proceedings arising out of or relating to this agreement shall be heard and determined by the Bankruptcy Court. If the Bankruptcy Court declines to assert jurisdiction over such proceedings, then the parties agree that any state or federal court of competent jurisdiction sitting in the state of Michigan shall have non-exclusive jurisdiction over such actions and proceedings. WE AND THE COMPANY HEREBY AGREE TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THE AGREEMENT OR OUR PERFORMANCE THEREUNDER.

11. This agreement (including all Annexes hereto) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction (including the Bankruptcy Court) to be invalid, void, unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. This agreement may not be amended or otherwise modified or waived except by an instrument in writing signed by both us and the Company. This agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. This agreement shall be binding upon the Company and us and its and our respective successors and permitted assigns.

12. We acknowledge and agree that we may not assign or delegate our obligations and rights under, and our consideration pursuant to, this Agreement to any other person without the prior written consent of the Company, which may be granted or withheld in the Company's sole discretion.

*(Signature page follows)*

MOELIS & COMPANY

We are delighted to accept this engagement and look forward to working with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this agreement. By affixing your signature hereto, you represent that you are a person authorized by the Company to enter into this agreement on its behalf.

Very truly yours,

MOELIS & COMPANY LLC

By: _____

    Name:  Thane Carlston
    Title:   Managing Director

Accepted and agreed to as of the date first written above:

GREEKTOWN HOLDINGS, LLC

By:_____

    Name: ~~D. Joe McCoy~~ **Tom Miller**
    Title:  Authorized Manager

- 10 -

NY\1447695.8
08-53104-wsd    Doc 493    Filed 10/06/08    Entered 10/06/08 14:44:18    Page 31 of 37

## ANNEX A

For the purposes hereof, "Transaction Value" shall equal an amount equal to the sum of (a) the aggregate fair market value (as determined below) of any securities issued, credit bid and any other non-cash consideration delivered by any Acquirer (including, without limitation, any joint venture interest delivered to, or acquired by, the Company), and any cash consideration paid by any Acquirer to the Company in connection with a Sale Transaction (including, without limitation and without duplication, cash consideration in respect of a Sale Transaction that is paid, at the direction of the Company, to retire or defease indebtedness for borrowed money or indebtedness evidenced by a note, of the Company or any of its subsidiaries, or to cure defaults under executory contracts to be assumed), plus payments made in installments, plus contingent payments (whether or not related to future earnings or operations) (subject to the payment terms set forth below), and (b) without duplication of amounts described in clause (a) above, the amount of all indebtedness for borrowed money or indebtedness evidenced by a note, of any entity owning the asset, property or business which is assumed or acquired by an Acquirer in connection with the Sale Transaction; provided, that "Transaction Value" shall not include, and to the extent applicable, there shall be deducted from any calculation of "Transaction Value" any amounts which the Company has agreed, or is otherwise obligated, to pay to or on behalf of an Acquirer at or following the closing of the Sale Transaction with respect to any costs or expenses related to the asset, property or operations of a business being sold. The fair market value of any debt or securities issued and any other non-cash consideration delivered to or acquired by the Company in connection with a Sale Transaction will be the value determined in good faith by the Company and us.

Notwithstanding any provision in this agreement to the contrary, if all or a portion of the Transaction Value consists of installment, contingent or other future payments (including amounts paid into escrow), then that portion of the Sale Transaction Fee attributable thereto shall be payable to us only upon actual receipt by the Company of such installment, contingent or other future payment.

## ANNEX B

In further consideration of the agreements contained in our engagement letter dated the date hereof (the "engagement"), in the event that Moelis or any of its divisions, affiliates, directors, officers, partners, members, agents or employees or any of its affiliates, or any other person controlling us or any of our affiliates (collectively, the "Indemnified Persons") becomes involved in any capacity in any action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person (including, without limitation, creditors of Greektown Holdings, LLC (the "Company"), members of the Company, a receiver, a custodian, a trustee appointed in any case or cases under title 11 of the United States Code commenced by or against the Company or any of its subsidiaries or affiliates, whether individually or on a consolidated basis (a "Bankruptcy Case"), an official committee appointed in a Bankruptcy Case, or a litigation trust, liquidating trust or similar vehicle created in connection with a Bankruptcy Case (or a trustee of such trust or similar vehicle)), in connection with or as a result of the engagement or any matter referred to in the engagement, the Company will reimburse such Indemnified Person for its reasonable and customary legal and other expenses (including, without limitation, the costs and expenses incurred in connection with investigating, preparing for and responding to third-party subpoenas or enforcing the engagement) incurred in connection therewith as such expenses are incurred. The Company will also indemnify and hold harmless any Indemnified Person from and against, and the Company agrees that no Indemnified Person shall have any liability to the Company or its owners, parents, affiliates, security holders or creditors for, any losses, claims, damages or liabilities (including actions or proceedings in respect thereof) (collectively, "Losses") (A) related to or arising out of (i) the Company's actions or failures to act (including statements or omissions made or information provided by the Company or its agents) or (ii) actions or failures to act by an Indemnified Person with the Company's consent or in reliance on the Company's actions or failures to act or (B) otherwise related to or arising out of the engagement or our performance thereof, except that this clause (B) shall not apply (i) to any Losses that are finally determined by a court or arbitral tribunal to have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

If such indemnification for any reason (other than such Indemnified Person's bad faith, willful misconduct or gross negligence as finally determined by a court of competent jurisdiction or arbitral tribunal to have caused the Losses) is not available or is insufficient to hold an Indemnified Person harmless, the Company agrees to contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, on the one hand, and by us, on the other hand, with respect to the engagement or, if such allocation is determined by a court or arbitral tribunal to be unavailable, in such proportion as is appropriate to reflect other equitable considerations, such as the relative fault of the Company on the one hand and of us on the other hand; provided, however, that, to the extent permitted by applicable law, the Indemnified Persons shall not be responsible for amounts which, in the aggregate, are in excess of the amount of all fees actually received by us from the Company in connection with the engagement. Relative benefits to the Company, on the one hand, and us, on the other hand, with respect to the engagement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by the Company or its security holders, as the case may be, pursuant to the

transaction(s), whether or not consummated, contemplated by the engagement, bears to (ii) all fees actually received by us in connection with the engagement.

The Company will not, without our prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination includes a release of each Indemnified Person from any liabilities arising out of such action, claim, suit, investigation or proceeding. The Company will not permit any such settlement, compromise, consent or termination to include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of an Indemnified Person, without such Indemnified Person's prior written consent. No Indemnified Person seeking indemnification, reimbursement or contribution under this agreement will, without the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

Prior to entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify us in writing thereof (if not previously so notified) and, if requested by us, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein in an amount and upon terms and conditions that we reasonably believe will satisfy the Company's obligations.

Promptly (and in any event within five days) after receipt by an Indemnified Person of actual notice of its involvement in any action, proceeding or investigation (collectively, "Proceeding") for which indemnification is being sought hereunder, such Indemnified Person will notify the Company in writing of such involvement. Failure to so notify the Company will not relieve the Company from liability which it may have to any Indemnified Person hereunder, except to the extent that the Company is prejudiced in any respect by such failure, and the Company will not be required to bear any fees or disbursements of counsel retained by an Indemnified Person that were incurred prior to the delivery of such notice to the Company. The Company shall be entitled to assume the defense of all Indemnified Persons in connection with the Proceeding, including the employment of counsel reasonably satisfactory to such Indemnified Person, and the payment of the fees and disbursements of such counsel. Notwithstanding the Company's decision to assume the defense of any Proceeding, (x) its right to enter into any compromise or settlement of the Proceeding shall be limited as set forth in the next paragraph of this Annex B, and (y) the Indemnified Person shall have the right to employ separate counsel and to participate in the defense of the Proceeding. Such counsel shall be at the expense of the Indemnified Person, unless (i) representation of the Company and the Indemnified Person by the same counsel, or conduct by the Company of the defense of the Indemnified Person, would be inappropriate due to actual or potential differing interests between the Company and such Indemnified Person (including any allegation that an Indemnified Person acted or failed to act in bad faith, engaged

in willful misconduct, or was grossly negligent), (ii) there may be defenses available to the Indemnified Person which are different from the defenses available to the Company or (iii) the Company fails to assume the defense of the Proceeding or to employ counsel reasonably satisfactory to the Indemnified Person, in each case in a timely manner, which prejudices such Indemnified Person. In the event of the circumstances set forth in the immediately preceding sentence, then the Indemnified Person may employ separate counsel at the Company's expense to represent or defend it in any such Proceeding or group of related Proceedings (it being agreed that the Company shall not, under any of the circumstances described in clause (i) or (ii) of the immediately preceding sentence, have the right to direct the defense of the Proceeding on behalf of the Indemnified Person). In no event shall the Company be liable for the fees and expenses of more than one separate firm of attorneys for all Indemnified Persons in connection with any Proceeding, plus one firm of local counsel in each jurisdiction in which any such Proceeding is taking place.

The Company's obligations hereunder shall be in addition to any rights that any Indemnified Person may have at common law or otherwise. The Company acknowledges that in connection with the engagement we are acting as an independent contractor and not in any other capacity, with duties owing solely to the Company. This agreement and any other agreements relating to the engagement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. All actions and proceedings arising out of or relating to this agreement shall be heard and determined by the Bankruptcy Court. If the Bankruptcy Court declines to assert jurisdiction over such proceedings, then the parties agree that any state or federal court of competent jurisdiction sitting in the state of Michigan shall have non-exclusive jurisdiction over such actions and proceedings. WE HEREBY AGREE, AND THE COMPANY HEREBY AGREES TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THE ENGAGEMENT OR OUR PERFORMANCE THEREOF.

MOELIS & COMPANY

The provisions of this *Annex B* shall apply to the engagement referred to in the engagement letter dated the date hereof (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

GREEKTOWN HOLDINGS, LLC

By: _____

    Name: ~~D. Joe McCoy~~**Tom Miller**
    Title: Authorized Manager

Accepted and agreed to as of the date hereof:

MOELIS & COMPANY LLC

By: _____

    Name: Thane Carlston
    Title: Managing Director

- B-4 -

## ANNEX C

1.      Any entity engaged in the gaming business, which is at least majority-owned by one or more Native American tribes

2.      Entertainment Interest Group, LLC

3.      Ted Gatzaros

4.      Penn National Gaming Inc.

5.      Millennium Management Group, L.L.C. and its affiliates